**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

MIG HOLDINGS LLC,
MADISON INTERNATIONAL
INSURANCE COMPANY, I.I.,
MADISON RE HOLDING COMPANY, INC.
and
MADISON RE INTERNATIONAL
INSURER

         Plaintiffs,

v.

MARK SIMS, ARAN QUINN,
MARK BARWICK, JOHN BLOOM,
MOUAD BOUGHAMZA, ANN MARIE
CHAMBLISS, TIERRE EMERSON,
CARTER SIMS, JOHN CHONG, and
REESE ATTAR

         Defendants.

Case No. _____

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiffs MIG Holdings LLC ("MIG Holdings"), Madison International Insurance Company, I.I. ("MIICII"), Madison Re Holding Company Inc. ("MadReH"), and Madison Re I.I. ("MadReII") (collectively referred to as "Madison" or the "Company"), by and through undersigned counsel, bring this action against Defendants Mark Sims ("M. Sims"), Aran Quinn ("Quinn"), Mark Barwick ("Barwick"), Mouad Boughamza ("Boughamza"), John Bloom ("Bloom"), Ann Marie Chambliss ("Chambliss"), Tierre Emerson ("Emerson"), Carter Sims ("C. Sims"), John Tsai Meu Chong ("Chong"), and Reese Attar ("Attar")  (collectively, "Defendants"), and allege as follows:

*MIG Holdings LLC, et al. v. Mark Sims et al.*; Case No. _____
Complaint
Page 2

## INTRODUCTION

1.      This action relates to a surreptitious and systematic attack on Madison, a leading enterprise-risk insurance company in Puerto Rico, perpetrated by M. Sims, Madison's former President, and Quinn, Madison's former outside counsel.

2.      Madison comprises a family of insurance companies and related entities which include MadReH, MadReII, MIG Holdings, MICII, and MICII Employees.

3.      Since at least 2011, M. Sims acted as President of MadReH, MadReII, MIG Holdings, and MICII. Since at least 2011 and until May 2026,  M. Sims served as a member of the board of directors of MadReH, MadReII, MIG Holdings, and MICII.

4.      In his capacity as President and member of the board of directors of Madison, M. Sims had the legal duty to act: (1) in accordance with the objectives and purpose of Madison; (2) execute his functions in a diligent and prudent manner; and (3) execute his functions with loyalty and for the benefit of Madison and its shareholders.

5.      Quinn was engaged as outside legal counsel to Madison since at least January 2020 until the date of his resignation, May 19, 2026. As such, Quinn had legal and ethical obligations toward his client, Madison to not divulge or exploit trade secrets and confidential business information of the Company obtained by him in the course of providing legal advice and services to the Company, for his own benefit and to the detriment of Madison. As counsel for Madison, he also had the legal obligation to refrain from participating with, aiding or abetting M. Sims in his breach of his fiduciary duties to Madison.

6.      M. Sims and Quinn created ARCA, a Puerto Rico corporation which, according to its certificate of incorporation filed with the State Department of Puerto Rico, was created for the purpose of "act[ing] as a holding company in respect to a Puerto Rico international insurer to be

organized and authorized in accordance to Chapter 61 of the Puerto Rico Insurance Code". Thus, the purpose of ARCA is to allow M. Sims and Quinn to ultimately incorporate an international insurer who will act as a direct competitor of Madison. In order to achieve this goal, M. Sims and Quinn have unlawfully targeted/solicited Madison's customers, key employees and misappropriated Madison's trade secrets and confidential business information, all in an effort to undermine and disrupt or destroy Madison's business operations.

7.      M. Sims and Quinn carried out this illicit scheme in coordination with Barwick, Bloom, Chambliss, Emerson, C. Sims, Boughamza, Chong and Attar, – each of whom are former senior employees of Madison, (and in the case of Quinn, former counsel who pretextually terminated his representation) – who all simultaneously resigned as employees of Madison and joined M. Sims and Quinn in their efforts to ultimately incorporate an international insurer to compete with Madison.

8.      Upon information and belief, in the weeks and months leading up to their resignations from Madison and defection to ARCA, M. Sims, Barwick, Emerson, Bloom, Chambliss, C. Sims, Boughamza, Chong, and Attar misappropriated Madison's trade secrets and confidential business information, including, but not limited to: financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related information, which they have since utilized, and will continue to utilize, in their efforts to incorporate an international insurer who will compete with Madison, replicating Madison's business model, and targeting Madison's customers.

*MIG Holdings LLC, et al. v. Mark Sims et al.*; Case No. _____
Complaint
Page 4

9.    Upon information and belief, M. Sims knowingly solicited and hired Barwick, Bloom, Mouad Boughamza, Chambliss, C. Sims, Chong, and Attar to join him in this ARCA endeavor in violation of a restrictive covenant prohibiting him from soliciting employees of MIG Holdings and its subsidiaries.

10.    Accordingly, Madison brings this action to obtain emergency and permanent injunctive relief and assert causes of action under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and for breach of contract and violations of the Puerto Rico Industrial and Trade Secret Protection Act, Act 80-2011, as amended, 10 L.P.R.A.§§413 et seq.,  breach of fiduciary duty, breach of duty of loyalty, unfair competition, defamation, and to enjoin Defendants' unlawful actions and to recover the substantial damages they have caused[1].

## **PARTIES**

11.    Plaintiff MadReH is a Puerto Rico corporation with its principal place of business located at Corporate Office Park 42 Carr #20, Ste. 203, Bo. Monacillos AGM Office & Comm Bldg., Guaynabo, PR 00966.

12.    Plaintiff MadReII, a holly own subsidiary of MadReH, is a Puerto Rico International Insurer with its principal place of business located at Corporate Office Park 42 Carr #20, Ste. 203, Bo. Monacillos AGM Office & Comm Bldg., Guaynabo, PR 00966.

13.    Plaintiff MIG Holdings is a Puerto Rico limited liability company with its principal place of business located at Corporate Office Park 42 Carr #20, Ste. 203, Bo. Monacillos AGM Office & Comm Bldg., Guaynabo, PR 00966.

---

[1] Defendants also violated Georgia's Misappropriation of Trade Secrets Act (O.C.G.A. §§ 10-1-760-10-1-767), violations of the Texas Uniform Trade Secrets Act, violations of the Indiana's Uniform Trade Secrets Act (IUTSA) (Ind. Code §§ 24-2-3-1 to 24-2-3-8), violations of the Illinois Trade Secrets Act (ITSA), (765 ILCS 1065/1 to 1065/9).

14. Plaintiff MIICII, a wholly-owned subsidiary of MIG Holdings, is a Puerto Rico International Insurer with its principal place of business located at Corporate Office Park 42 Carr #20, Ste. 203, Bo. Monacillos AGM Office & Comm Bldg., Guaynabo, PR 00966.

15. During the relevant time periods described in this Complaint, Defendant M. Sims was a resident of the State of Indiana. M. Sims was employed by Madison since 2011 until the effective date of his immediate, surprise voluntary resignation on July 7, 2026. At the time of his resignation, M. Sims held the position of President of Madison. Over the course of his employment with Madison, M. Sims entered into numerous agreements with Madison, including, but not limited to, the Limited Liability Company Agreement among MIG Holdings LLC (f/k/a CapAlt Holdings LLC) and the Members Named Herein (the "Agreement"). In the Agreement, M. Sims agreed to be bound by certain confidentiality, non-compete, non-solicit, and non-circumvent covenants in exchange for 500 Class C units in MIG Holdings LLC (f/k/a CapAlt Holdings, LLC). Notwithstanding those obligations, however, immediately before resigning, M. Sims violated the Agreement by sending out an email from his competitor ARCA email address to Madison's client and referral list, informing them of his resignation and directing them to contact him through ARCA. Over the course of his employment with Madison, M. Sims had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related information.

16. During the relevant time periods described in this Complaint, Quinn was a resident of the State of Illinois. Quinn is a licensed attorney currently admitted to practice in the states of

Illinois and Nevada. Quinn served as Madison's outside legal counsel for approximately six (6) years until he unilaterally and pretextually terminated his representation of Madison on May 19, 2026. As an essential fiduciary legal advisor to Madison, Quinn had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to: financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related information. On June 25, 2026, just one month after pretextually terminating his representation of Madison, Quinn incorporated ARCA Holdings Inc., whose stated business purpose is to act as a holding company in respect to a Puerto Rico international insurer under Chapter 61 of the Puerto Rico Insurance Code, such international insurer to be a direct competitor of Madison. Despite the obvious conflict of interest, Quinn serves as the President and Secretary for ARCA Holdings Inc. On July 7, 2026, after M. Sims, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, and Chong resigned, M. Sims announced Quinn as part of the ARCA leadership team, with Quinn serving as the legal and tax counsel.

17.     During the relevant time periods described in this Complaint, Barwick was a resident of the State of Georgia. Barwick was employed by Madison for approximately 9 years until the effective date of his voluntary resignation on July 7, 2026. Over the course of his employment with Madison, Barwick had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related

information.  At the time of his resignation, Barwick held the position of Director of Underwriting at Madison Insurance Group.  The same day that Barwick resigned, M. Sims announced Barwick as part of the ARCA leadership team, with Barwick serving as the Director of Underwriting, the same position he held at Madison.

18.      During the relevant time periods described in this Complaint, Bloom was a resident of the State of Texas.  Bloom was employed by Madison for approximately 18 months until the effective date of his voluntary resignation on July 7, 2026.  Over the course of his employment with Madison, Bloom had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to: financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related information  At the time of his resignation, Bloom held the position of Director of Business Development at Madison Insurance Group.  The same day that Bloom resigned, M. Sims announced Bloom as part of the ARCA leadership team, with Bloom serving as the Director of Business Development, the same position he held at Madison.

19.      During the relevant time periods described in this Complaint, Chambliss was a resident of the State of Georgia. Chambliss was employed by Madison for approximately 14 years until the effective date of her voluntary resignation on July 7, 2026.  Over the course of her employment with Madison, Chambliss had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to: financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the

companies, pricing models, market data and proprietary business strategies, and related information. At the time of her resignation, Chambliss held the position of Chief Operating Officer at Madison Insurance Group. The same day that Chambliss resigned, M. Sims announced Chambliss as part of the ARCA leadership team, with Chambliss serving as the Chief Operating Officer, the same position she held at Madison.

20. During the relevant time periods described in this Complaint, Emerson was a resident of the State of Indiana. Emerson was employed by Madison for approximately 5 years until the effective date of her voluntary resignation on July 7, 2026. Over the course of her employment with Madison, Emerson had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to: financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related information. At the time of her resignation, Emerson held the position of Director of Client Relations at Madison Insurance Group. The same day that Emerson resigned, M. Sims announced Emerson as part of the ARCA leadership team, with Emerson serving as the Director of Client Relations, the same position she held at Madison.

21. During the relevant time periods described in this Complaint, C. Sims was a resident of the State of Illinois. C. Sims is the son of M. Sims. C. Sims was employed by Madison for approximately 5 years until the effective date of his voluntary resignation on July 7, 2026. Over the course of his employment with Madison, C. Sims had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and

reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related information. At the time of his resignation, C. Sims held the position of Director of Marketing/Business Development Coordinator. The same day that C. Sims resigned, M. Sims announced C. Sims as part of the ARCA leadership team, with C. Sims serving as the Director of Marketing and Client Development, virtually the same position he held at Madison.

22.     During the relevant time periods described in this Complaint, Chong was a resident of the State of Texas. Chong was employed by Madison for approximately 2 years until the effective date of his voluntary resignation on July 7, 2026. Over the course of his employment with Madison, Chong had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to: financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related information. At the time of his resignation, Chong held the position of Business Development. The same day that Chong resigned, M. Sims announced Chong as part of the ARCA leadership team, with Chong serving as the Director of Strategic Partnerships, virtually the same position he held at Madison.

23.     During the relevant time periods described in this Complaint, Reese Attar was a resident of the State of Indiana. Attar was employed by Madison for approximately eleven months until the effective date of her voluntary resignation on July 13, 2025. Over the course of her employment with Madison, Attar had access to Madison's confidential and proprietary information and trade secrets, including, but not limited to: financial, risk profile, policy structure, actuarial, and contact information of individual clients; client lists, insurance and reinsurance portfolio

actuarial analysis; underwriting, investment and risk profiling guidelines of the companies, pricing models, market data and proprietary business strategies, and related information.  At the time of her resignation, Attar held the position of Client Relations Representative at Madison Insurance Group.  Before her resignation, Attar commenced employment with ARCA, serving as the "Client Relations Representative", the same position she held at Madison.

## JURISDICTION AND VENUE

24.     This action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

25.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

26.     This Court has supplemental jurisdiction over Madison's common law, territorial, and state statutory claims pursuant to 28 U.S.C. § 1367.

27.     As all the plaintiffs are residents of Puerto Rico and all the defendants are not residents of Puerto Rico, and the damages suffered exceed seventy-five thousand dollars ($75,000.00), supplemental diversity jurisdiction under 28 U.S.C. § 1332(a) applies.

## FACTS

A.     **Madison's Business**

28.     Madison has been providing insurance services for over twenty-five (25) years, specializing in the design and administration of regulated risk-management programs for closely held middle-market businesses.

29.     Madison structures insurance programs that address material but traditionally uninsured exposures — including supply-chain disruption, key-customer concentration, regulatory actions, brand impairment, and other strategic risks that directly affect enterprise value. Each program is underwritten, governed, and administered within a regulated Puerto Rico insurance framework, providing statutory oversight and disciplined risk management.

30.     Madison has spent substantial time, effort, and resources to develop this regulated Puerto Rico structure and Segregated Asset Plan ("SAP") model, which allows operational flexibility, transparent governance, and long-duration premium flows without reliance on small-business captive risk.

31.     Madison has also spent substantial time, effort, and resources developing a network that promotes their SAP business model, working with CFOs, advisors, and private-client firms.

**B.     M. Sims Employment and Restrictive Covenants**

32.     M. Sims was employed by Madison for over fifteen (15) years until the effective date of his voluntary resignation on July 7, 2026.

33.     At the time of his resignation, M. Sims held the position of President of Madison Insurance Group.

34.     As an officer/executive, M. Sims had fiduciary duties and a duty of loyalty to Madison.

35.     In addition to his fiduciary duties, M. Sims entered into numerous agreements with Madison, including, but not limited to, the Limited Liability Company Agreement among MIG Holdings LLC (f/k/a CapAlt Holdings LLC) and the Members Names Herein (the "Agreement"). A true and correct copy of the executed agreement is attached hereto as **Exhibit 1**.

36.     In the Agreement, in exchange for ownership interests (500 Class C units in CapAlt Holdings, LLC.), M. Sims agreed to be bound by certain confidentiality, non-compete, non-solicit, and non-circumvent covenants (the "Restrictive Covenants")

37.     The Restrictive Covenants provide in pertinent part:

**Section 11.01 Confidentiality**

(a)     Each Member acknowledges that during the term of this Agreement, he will have access to and become acquainted with

trade secrets, proprietary information, and confidential information belonging to the Company, the Company Subsidiaries, and their Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, ***"Confidential Information").*** In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing his investment in the Company or performing his duties as a Board Member or other service provider of the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during his association or employment with the Company or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

[. . .]

### Section 11.02  Non-Compete; Non-Solicit; Non-Circumvent.

(a)    **Non-Compete.** In light of each Member's access to Confidential Information and position of trust and confidence with the Company, each Member hereby agrees that, during the period of his continued engagement with the Company or any Company Subsidiary and for a period of three (3) years, running consecutively, beginning on the last day of the Member's engagement with the Company or any Company Subsidiary for any reason or no reason (the ***"Restricted Period"),*** such Member shall not (x) render services or give advice to, or affiliate with (as employee, partner, consultant, or otherwise), or (y) directly or indirectly through one or more of any of their respective Affiliates, own, manage, operate, control, or participate in the ownership, management, operation, or control of, any Competitor or

any division or business segment of any Competitor. For purposes of this Section 11.02(a), ***"Competitor"*** means any other Person engaged, directly or indirectly, in whole or in part, in the same or similar business as the Company or any Company Subsidiary within Puerto Rico or the United States, specifically International Re Ltd, Advantage Business Insurance Company (Puerto Rico) I.I., Advantage Insurance Management (USA) LLC, CIC Services LLC, Ryan LLC, or any other similarly situated company or subsidiary of such company engaged in the business of reinsurance, insurance, underwriting, risk management, risk management consulting, or insurance procurement services.

**(b)** **Non-Solicit of Employees.** In light of each Member's access to Confidential Information and position of trust and confidence with the Company or any Company Subsidiary, each Member further agrees that, during the Restricted Period, he shall not, directly or indirectly through one or more of any of their respective Affiliates, hire or solicit, or encourage any other Person to hire or solicit, any individual who has been employed by the Company or any Company Subsidiary within three (3) year prior to the date of such hiring or solicitation, or encourage any such individual to leave such employment. This Section 11.02(b) shall not prevent a Member from hiring or soliciting any employee or former employee of the Company or any Company Subsidiary who responds to a general solicitation that is a public solicitation of prospective employees and not directed specifically to any Company or Company Subsidiary employees.

**(c)** **Non-Solicitation of Clients.** In light of each Member's access to Confidential Information and position of trust and confidence with the Company, each Member further agrees that, during the Restricted Period, he shall not, directly or indirectly through one or more of any of their respective Affiliates, solicit or entice, or attempt to solicit or entice, any clients, customers, or suppliers of the Company or any Company Subsidiary for purposes of diverting their business or services from the Company.

**(d)** **Non-Circumvention.** No Member shall, directly or indirectly, except in collaboration with or with the prior express written consent of the Board:

(i) enter into any transaction with any party or parties introduced to the Member by the Company or any Company Subsidiary (the "Introduced Party"), similar to, in competition with, or which otherwise could have the effect of preventing the Company or any Company Subsidiary from receiving the full benefit of the transaction;

(ii)     solicit the Introduced Party to enter in to such transaction; or

(iii)     induce, solicit, procure, or otherwise encourage its representatives or any third party, or response to any solicitation from any of the same, to enter into any such transaction.

(e)     **Blue Pencil.** If any court of competent jurisdiction determines that any of the covenants set forth in this Section 11.02, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Section 11.02, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by Applicable Law. The parties hereto expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

38.     In summary, the Restrictive Covenants prohibited M. Sims from soliciting Madison employees and clients during M. Sims' continued engagement with the Company and for a period of three (3) years after his engagement with Madison ended.

39.     The Restrictive Covenants also prohibited M. Sims from competing with Madison during M. Sims' continued engagement with the Company and for a period of three (3) years after his engagement with Madison ended.

40.     Despite being bound by the Restrictive Covenants in the Agreement, M. Sims orchestrated a coordinated attack on Madison while serving as its President.

## C.     Conspiracy to Misappropriate Madison's Confidential Information and Trade Secrets

41.     Beginning in Spring 2025, M. Sims began meeting with his co-conspirators, plotting the takeover and/or downfall of Madison, and using his Madison issued credit card to purchase travel and accommodations.

42.    On or about the week of March 18, 2025, M. Sims, Quinn, Barwick, Chambliss, and C. Sims met in person in Puerto Rico.  This was not an officially scheduled Madison staff meeting, and the CEO was neither invited to participate, nor was informed of said meeting. M. Sims used his corporate credit card to pay for hotel accommodation for himself, Quinn, Barwick, Chambliss, and C. Sims.

43.    On or about the week of August 5, 2025, M. Sims, Quinn, Barwick, C. Sims, Chambliss, and Emerson met in person in Puerto Rico.  This was not an officially scheduled Madison staff meeting, and the CEO was neither invited to participate, nor was informed of said meeting. M. Sims used his corporate credit card to pay for hotel accommodation for himself, Quinn, Barwick, Chambliss, C. Sims, and Emerson.

44.    On or about the week of August 17, 2025, M. Sims, Quinn, and Chambliss met in person in Puerto Rico.  This was not an officially scheduled Madison staff meeting, and the CEO was neither invited to participate, nor was informed of said meeting. M. Sims used his corporate credit card to pay for hotel accommodation for himself, Quinn, and Chambliss.

45.    On or about the week of September 3, 2025, M. Sims, Quinn, Chambliss, Barwick, C. Sims, Emerson, and Bloom met in person in Puerto Rico.  This was not an officially scheduled Madison staff meeting, and the CEO was neither invited to participate, nor was informed of said meeting. M. Sims used his corporate credit card to pay for hotel accommodation for himself, Quinn, Barwick, Chambliss, C. Sims, Emerson, and Bloom.

46.    On the week of January 7, 2026, M. Sims, Quinn, Barwick, Chambliss, Emerson, Bloom, and Chong met in person in Puerto Rico.  This was not an officially scheduled Madison staff meeting, and the CEO was neither invited to participate, nor was informed of said meeting.

*MIG Holdings LLC, et al. v. Mark Sims et al.*; Case No. _____
Complaint
Page 16

M. Sims used his corporate credit card to pay for hotel accommodation for himself, Quinn, Barwick, Chambliss, Emerson, Bloom, and Chong.

47.     On the week of March 23, 2026, M. Sims, Quinn, Barwick, Chambliss, C. Sims, Bloom, Emerson, and Chong met in person in Puerto Rico.  This was not an officially scheduled Madison staff meeting, and the CEO was neither invited to participate, nor was informed of said meeting. M. Sims used his corporate credit card to pay for hotel accommodation for himself, Quinn, Barwick, Chambliss, C. Sims, Emerson, Chong, and Bloom.

48.     Upon information and belief, the Defendants utilized these above referenced meetings to concoct their unlawful scheme to start a competing insurance company in Puerto Rico (now realized as ARCA) and to systematically misappropriate Madison's confidential and proprietary information and trade secrets, while on Madison's dime and time.

**D.     Misappropriation of Confidential and Proprietary Information, and Trade Secrets, and Quinn's Formation of ARCA**

49.     After months of careful planning, the Defendants began putting their plan into action.

50.     On or about May 18, 2026, M. Sims resigned from the Board of Directors of MadReH and MadReII,

51.     On or about May 19, 2026, Quinn unilaterally terminated his representation of Madison.

52.     Immediately thereafter, between May 19 and May 28, 2026, C. Sims utilized Madison's Sales Force to generate the following reports: Contacts & Accounts, New Leads & Referrals, Campaigns (leads), Campaigns (contracts), and New Opportunities, which totals approximately 10,570 kilobytes of confidential information, including client names, contact

information, referral sources, and policy information.  In total, the reports C. Sims generated contain 12,111 entries of current account holders or new lead and referral opportunities.

53.     Upon information and belief, C. Sims generated and downloaded the aforementioned reports in preparation for incorporating ARCA and unlawfully competing with Madison.

54.     Upon information and belief, M. Sims, Barwick, Bloom, Boughamza, Chambliss, Chong, and Attar also used their Company issued credentials to obtain and misappropriate Madison's Confidential Information in late May through early July of 2026.

55.     The Confidential Information was misappropriated for the sole purpose of creating a carbon copy of Madison (i.e. ARCA).

56.     During the thirty (30) days leading to his resignation on July 7, 2026, M. Sims deleted more than 33,000 emails from his email account at Madison.

57.     On June 25, 2026, Quinn incorporated ARCA Holdings Inc.

58.     In their Certificate of Incorporation, ARCA Holdings, Inc. provides that the nature and purpose of their business is to "act as a holding company in respect to a Puerto Rico international insurer to be organized and authorized in accordance to Chapter 61 of the Puerto Rico Insurance Code." *See* Certificate of Incorporation attached hereto as **Exhibit 2**.

59.     Quinn serves as the President and Secretary of ARCA Holdings Inc.

### E.     Defendants Commence Unlawful Competition and Resign

60.     On July 7, 2026, at 8:38 AM (EST) M. Sims submitted his letter of resignation via E-mail to Madison.

61.    Approximately one minute later, at 8:39AM (EST), C. Sims, Bloom, Chong, and Chambliss each submitted resignation letters via E-mail to Madson.

62.    Mark Barwick submitted his letter of resignation via E-Mail to Madison approximately five (5) minutes later, at 8:44 AM (EST).

63.    Tierre Emerson submitted her letter of resignation via E-Mail to Madison approximately four (4) minutes later, at 8:48 AM (EST).

64.    Boughamza submitted his letter of resignation via E-Mail to Madison at 8:57 AM (EST).

65.    Before submitting his resignation, M. Sims began emailing Madison's clients from his ARCA email, attempting to unlawfully solicit the clients with the stolen Madison client list.

66.    The Email M. Sims sent states as follows:

Hello [Client Name],

Because of the relationships we've built over the years, I wanted you to hear this directly from me.

After decades with Madison Insurance Group, I've made the decision to step down as President, effective today, July 7, 2026. It wasn't a decision I made lightly, Madison has been a huge part of my life, and I'm grateful for the people, the partnerships, and the trust so many of you placed in me.

I know a change like this raises immediate questions about your account, and I would encourage you to contact Madison directly.  In the meantime, if you have concerns or just want to talk through what this means for you, please call me directly, I'm glad to make time.

So, what's next?

Throughout my career, my passion has always been enterprise risk. I believe the future belongs to organizations that help businesses move beyond simply purchasing insurance. That's the work I want to spend the next chapter on, and it's why I'm joining ARCA Risk.

*MIG Holdings LLC, et al. v. Mark Sims et al.*; Case No. _____
Complaint
Page 19

For decades, Fortune 500 companies have used sophisticated risk financing to retain underwriting profits and gain more control over their insurance programs. ARCA's mission is to bring those same strategies to the middle-market companies that have never had access to them.

I'd like to remain in contact with you as we embark on this new chapter. Here are a few ways to do that:

- Call me directly - [M. Sims's phone number] - I mean that. If you want to talk through what this means for you, or just catch up, I'm a phone call away.

- Join our Virtual ARCA Town Hall on July 28th, where I'll introduce the leadership team and share our vision in more detail. Invitation and RSVP link coming by July 15th.

I know this is a lot to take in, and I don't take that lightly. The trust you've placed in me over the years means more than I can put in an email. I am deeply grateful for your friendship. I'm available to you, anytime, so please reach out.

With gratitude,
Mark Sims
CEO

[M. Sims's email address]
[M. Sims's phone number]
ArcaRisk.com

67.     The link provided in the email takes users to the ARCA website. A screenshot of the webpage is provided below.

*MIG Holdings LLC, et al. v. Mark Sims et al.*; Case No. _____
Complaint
Page 20



68.     Accordingly, M. Sims was actively forming a competitive entity while employed by Madison, developing a website for that entity using Madison's website development and branding vendor, and poaching Madison's key employees and leadership to join ARCA.

69.     Upon information and belief, Defendants paid for the ARCA website with Madison's capital and used Madison's confidential and proprietary information to create the website.

70.     Following his resignation, M. Sims continued to send out email correspondence to Madison clients from Madison's stolen client list.

71.     Specifically, M. Sims sent the following email to a Madison client in the evening of July 7, 2026:

> Hello again,
>
> Since sending my note earlier today, I've had the opportunity to speak with many of you. Thank you for your calls, emails, and words of encouragement, I'm truly grateful for the support.
>
> Since many of your questions centered on the same topic, I wanted to send a brief follow-up with more information.

*MIG Holdings LLC, et al. v. Mark Sims et al.*; Case No. _____
Complaint
Page 21

My passion has always been enterprise risk. ARCA gives us the opportunity to deepen that focus while retaining the advantages of a Puerto Rico-based insurance company, a combination we believe creates a stronger platform for our clients, today and for years to come.

Our Enterprise Risk Management platform gives policyholders the opportunity to participate in the underwriting and investment performance generated by their own well-managed risk, creating stronger alignment, greater transparency, and long-term value.

Just as important as our vision is the team. We all share a common belief in where the enterprise risk marketplace is headed and how clients should be served. Many of these are individuals you've come to know over the years. Together, they represent decades of experience across enterprise risk management, underwriting, operations, client relations, strategic partnerships, marketing, and investment management. More importantly, we all have worked together successfully, earning the confidence of clients and partners through expertise, responsiveness, and trusted relationships.

It is my pleasure to introduce the ARCA leadership team:

Aran Quinn – [ARCA Email] – Legal and Tax Counsel

Carter Sims – [ARCA Email] - Director of Marketing and Client Development

Mark Barwick – [ARCA Email] - Director of Underwriting

Mouad Boughamza – [ARCA Email] - Senior Cyber & Enterprise Risk Underwriting / Project Manager

Ann Marie Chambliss – [ARCA Email] - Chief Operating Officer

John Bloom – [ARCA Email] - Director of Business Development

John Chong – [ARCA Email] - Director of Strategic Partnerships

Tierre Emerson – [ARCA Email] - Director of Client Relations

I hope you'll join us for our virtual ARCA Town Hall on July 28, where you'll have the opportunity to meet the team, learn more about our vision, and ask any questions you may have.

In the meantime, please continue to reach out. My phone is on, and I will personally return every call.

Thank you again for your friendship, your confidence, and your support.

Gratitude

Mark Sims
CEO
[ARCA Email]
[Phone number]
ArcaRisk.com

72. Upon information and belief, M. Sims continues to contact Madison's clients, spreading false narratives about Madison, defaming Madison's leadership, and committing material breaches of his restrictive covenants.

73. Essentially, M. Sims, and their co-conspirators have/are creating a carbon copy of Madison's business structure, using the Madison business plans and models, competitive market information. client lists, campaign documents, leads, and referral lists they misappropriated from Madison.

74. Critically, Attar resigned on July 13, 2026, after she had already began working with ARCA.

75. Indeed, ARCA's investor materials, sent on Sims's first day at ARCA to Madison clients, attached hereto as **Exhibit 3**, replicate Madison's proprietary business plans, pricing, and marketing strategies near identically.

76. Moreover, ARCA 5-year forecast, attached hereto as **Exhibit 4**, and Investment Offering Term Sheet, attached hereto as **Exhibit 5**, are based off of – nearly line for line - Madison's proprietary business information and demonstrates ARCA's intent to continue their savage attack on Madison.

77.     In short, the Defendants created a carbon copy of Madison with Madison's stolen information and named it ARCA.

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**18 U.S.C. §1836**
**(Against all Defendants)**

78.     Madison incorporates by reference and realleges the allegations contained in paragraphs 1 through 77 above as if fully set forth herein.

79.     The Defend Trade Secrets Act of 2016 ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

80.     Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

81.     Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii)

at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5) (as amended).

82.      Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6) (as amended).

83.      Certain confidential and proprietary information of Madison constitutes trade secrets related to a product or service used in, or intended for use in, interstate commerce, including, but not limited to, its: (i) business plans and models; (ii) client lists and contact information; (iii) marketing strategies and future plans with respect to clients; (iv) client contracts, which set forth the key terms of such relationships; and (v) proprietary analytics, strategies, and methodologies relating to enterprise risk insurance and reinsurance, and pricing and contracting.

84.      Madison derives economic value from the fact that its trade secrets and confidential and proprietary information, including the categories of information described above, are not generally known to individuals or entities outside of Madison.

85.      Madison takes reasonable measures to protect the secrecy of such trade secrets and confidential and proprietary information. These measures include maintaining a dedicated IT

security staff, ensuring compliance with a documented Madison Confidentiality Policy, which is outlined in the Employee handbook, utilizing unique user IDs and strong passwords, and requiring third parties to sign non-disclosure agreements before accessing any Madison trade secrets or other confidential or proprietary information.

86.     M. Sims knew that he had a duty to maintain the secrecy of Madison's trade secrets and confidential and proprietary information due, in part, to his acknowledgement of such duties in the Agreement he signed.

87.     Quinn knew that he had a duty to maintain the secrecy of Madison's trade secrets and confidential and proprietary information as outside counsel for Madison.

88.     Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar knew they had a duty to maintain the secrecy of Madison's trade secrets and confidential and proprietary information via Madison's confidentiality policy.

89.     ARCA is under a legal duty to not accept any misappropriated trade secrets and confidential and proprietary information, including Madison's trade secrets and confidential and proprietary information, and ARCA is also under a equal legal duty not to disclose or use misappropriated trade secrets and confidential and proprietary information for the purpose of gaining a competitive advantage in the marketplace.

90.     Upon information and belief, ARCA, M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar have already and/or will improperly acquire, disclose, and use Madison's trade secrets and confidential and proprietary information without consent of any kind for their own financial gain.

91.     Upon information and belief, in the weeks leading up to the resignation of his employment with Madison, M. Sims misappropriated Madison's trade secrets and confidential and

proprietary information by accessing and downloading Madison's files, and/or sending himself/third parties Confidential Information via E-Mail or other electronic means.

92. Upon information and belief, Quinn misappropriated Madison's trade secrets and confidential and proprietary information by using the Confidential Information he received as Madison's outside counsel to create a competitor entity.

93. Upon information and belief, in the weeks leading up to the resignation of his employment with Madison, Barwick misappropriated Madison's trade secrets and confidential and proprietary information by accessing and downloading Madison's files, and/or sending himself/third parties Confidential Information via E-Mail or other electronic means.

94. Upon information and belief, in the weeks leading up to the resignation of his employment with Madison, Boughamza misappropriated Madison's trade secrets and confidential and proprietary information by accessing and downloading Madison's files, and/or sending himself/third parties Confidential Information via E-Mail or other electronic means.

95. Upon information and belief, in the weeks leading up to the resignation of his employment with Madison, Chambliss misappropriated Madison's trade secrets and confidential and proprietary information by accessing and downloading Madison's files, and/or sending herself/third parties Confidential Information via E-Mail or other electronic means.

96. Upon information and belief, in the weeks leading up to the resignation of his employment with Madison, Emerson misappropriated Madison's trade secrets and confidential and proprietary information by accessing and downloading Madison's files, and/or sending herself/third parties Confidential Information via E-Mail or other electronic means.

97. Upon information and belief, in the weeks leading up to the resignation of his employment with Madison, C. Sims misappropriated Madison's trade secrets and confidential and

proprietary information by accessing and downloading Madison's files, and/or sending himself/third parties Confidential Information via E-Mail or other electronic means.

98. Upon information and belief, in the weeks leading up to the resignation of his employment with Madison, Chong misappropriated Madison's trade secrets and confidential and proprietary information by accessing and downloading Madison's files, and/or sending himself/third parties Confidential Information via E-Mail or other electronic means.

99. Upon information and belief, in the weeks leading up to the resignation of his employment with Madison, Attar misappropriated Madison's trade secrets and confidential and proprietary information by accessing and downloading Madison's files, and/or sending herself/third parties Confidential Information via E-Mail or other electronic means.

100. M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar have and will continue to disclose and utilize Madison's trade secrets and confidential and proprietary information in the course of their employment with ARCA by using this information to unfairly compete with Madison by developing, among other things, Madison's business strategy with respect to enterprise risk insurance and reinsurance, pricing, and marketing.

101. M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar's actions constitute actual and/or threatened misappropriation in violation of the DTSA.

102. Madison has suffered and will continue to suffer harm as a result of M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar's actual and/or threatened breach of the DTSA, including loss of clients and employees, detriment to its goodwill and reputation, and an unfair reduction in its competitive advantage.

103.    Madison is entitled to actual damages from M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar, jointly and severally, and for attorneys' fees.

104.    M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar's actions will continue to cause harm to Madison and its trade secrets and confidential and proprietary information if not restrained.

## COUNT II
## BREACH OF CONTRACT
### (Against M. Sims)

105.    Madison incorporates by reference and realleges the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

106.    M. Sims entered into a Limited Liability Company Agreement among CapAlt Holdings LLC and the Members Names Herein (the "Agreement"), which contains valid, enforceable, and binding non-compete, non-solicit, and non-disclosure provisions, which serve to protect Madison's legitimate business interests, and which are reasonable in time and scope.

107.    The non-compete provision prohibits M. Sims from working with Madison's competitors during M. Sims' continued engagement with the Company and for a period of three (3) years after his engagement with Madison ended.

108.    As described above, ARCA is a competitor of Madison.

109.    The confidentiality provision prohibits M. Sims from disclosing information concerning Madison's business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents which the Company treats as confidential ("Confidential Information").

110.   The non-solicit provision prohibits M. Sims from soliciting Madison employees and clients during M. Sims' continued engagement with the Company and for a period of three (3) years after his engagement with Madison ended.

111.   M. Sims through his actions as set forth herein, breached the non-compete, non-solicit, and confidentiality provisions of the Agreement in several material respects, including, but not limited to: (i) forming and accepting competitive employment with ARCA prior to the expiration of his non-compete period; and (ii) using, disclosing, and making available Madison's trade secrets and confidential and proprietary information in connection with his relationship with ARCA, and soliciting Madison's employees to join ARCA.

112.   As a direct and proximate result of M. Sims breach, Madison has suffered substantial monetary and intangible damages.

**COUNT III**
**VIOLATION OF PUERTO RICO'S INDUSTRIAL**
**AND TRADE SECRET PROTECTION ACT**
**(Against all Defendants)**

113.   Madison incorporates by reference and realleges the allegations contained in paragraphs 1 through 112 above as if fully set forth herein.

114.   During their employment with Madison, M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar had direct and intimate knowledge of Madison's confidential and proprietary business information, as described hereinabove, information which is exclusive to Madison and is not generally known in the industry.

115.   Madison's confidential and proprietary information constitute trade secrets pursuant to the Trade Secrets Protection and Industrial Act of Puerto Rico, Act 80-2011, as amended, 10 L.P.R.A. §§ 4131 *et seq.* ("PRTSPIA"). The information derives independent economic value, actual and potential, from not being generally known to or readily ascertainable

through appropriate means by other persons who might obtain economic value from its disclosure or use.

116.    As described above, Madison made reasonable efforts under the circumstances to maintain the secrecy of the information by implementing and maintaining a confidentiality policy, ensuring confidential information was password protected, and incorporating confidentiality provisions in operating agreements and vendor contracts.

117.    M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar obtained these trade secrets while employed by Madison and is under a duty to maintain their secrecy.

118.    Capitalizing on Madison's investment of time, resources and goodwill, Defendants are using Madison's trade secrets to target Madison's clients and unfairly compete in the marketplace.

119.    As a result of Defendants' misappropriation, Madison has suffered harm in the form of actual and threatened misappropriation of Madison trade secrets and confidential information, injury and harm to its goodwill and business reputation and loss of confidence and trust among its customers.

120.    Madison has also suffered present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

121.    Unless restrained, M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar will continue to misappropriate Madison's trade secrets, causing even further injury to Madison's for which there is no adequate remedy at law.

122.    Pursuant to Article 8 of the PRTSPIA, Madison is entitled to a temporary restraining order and a preliminary and permanent injunctions barring M. Sims, Quinn, Barwick, Bloom,

Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar's continued actual and threatened misappropriation of Madison's trade secrets as set forth hereinabove.

123.    Madison is further entitled to an award of actual damages incurred as a result of M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar's wrongful acts, as well as an award of damages equal to their unjust enrichment and/or the imposition of a reasonable royalty as provided for by Article 8 of the PRTSPIA.

124.    Madison is also entitled to an award of exemplary damages, as well as its reasonable costs and attorneys' fees incurred hereby, pursuant to Articles 9 and 10 of the PRTSPIA.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### (Against M. Sims, Quinn, Chambliss)

125.    Madison incorporates by reference and realleges the allegations contained in paragraphs 1 through 124 above as if fully set forth herein.

126.    By virtue of M. Sims and Chambliss's employment relationship with Madison, as senior leaders of Madison, Madison reposed trust and confidence in them to provide services, and to refrain from acting in any manner contrary to Madison's interests.

127.    Accordingly, M. Sims and Chambliss owed Madison a fiduciary duty of loyalty to act in good faith and in Madison's best interests.

128.    Such fiduciary duty and duty of loyalty owed by M. Sims and Chambliss existed throughout their employment with Madison and survived the termination of that employment.

129.    M. Sims and Chambliss breached their fiduciary duty of loyalty to Madison by engaging in the wrongful activity as described herein, including but not limited to, the misappropriation of Madison's trade secrets and confidential and proprietary information for their benefit and the benefit of ARCA, a direct competitor of Madison.

*MIG Holdings LLC, et al. v. Mark Sims et al.*; Case No. _____
Complaint
Page 32

130.    M. Sims further breached his fiduciary duty to Madison by using his Madison issued credit card to pay for costs not associated with his job duties, including paying for his co-conspirators' travel accommodations when they would meet to plot the takeover/destruction of Madison.

131.    Chambliss further breached her fiduciary duty to Madison by approving costs and paying invoices that were not in Madison's best interest.

## COUNT X
## UNFAIR COMPETITION
### (Against all Defendants)

132.    Madison incorporates by reference and realleges the allegations contained in paragraphs 1 through 131 above as if fully set forth herein.

133.    During their employment with Madison, M. Sims, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar had access to Madison's trade secrets and confidential and proprietary information.

134.    Quinn also had access to trade secrets and confidential and proprietary information during his engagement as outside counsel.

135.    Upon information and belief, in the weeks leading up to the resignation of their employment with Madison, M. Sims, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar misappropriated Madison's trade secrets and confidential and proprietary information by copying files from Madison's data base without authorization.

136.    Upon information and belief, M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar took Madison's trade secrets and confidential and proprietary information to gain a competitive advantage over Madison and unjustly benefit from Madison's efforts and its expenditure of resources.

137.    Upon information and belief, M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar have utilized the trade secrets and confidential and proprietary information of Madison to develop ARCA's enterprise risk insurance and reinsurance business and unfairly compete against Madison.

138.    M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar's acts of unfair competition will directly and proximately cause substantial damage to Madison and its business, including the loss of market share and business with existing and prospective clients, as well as loss of its trade secrets and confidential and proprietary information and damage to its reputation.

139.    M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar's acts of unfair competition will directly and proximately cause Madison to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Madison and that Madison will continue to suffer by the continued acts of ARCA, M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar.

## COUNT XIII
## INJUNCTIVE RELIEF

140.    Madison incorporates by reference and realleges the allegations contained in paragraphs 1 through 139 above as if fully set forth herein.

141.    As pleaded above, Defendants' conduct has caused, and will continue to cause, Madison harm for which there is no adequate remedy at law, including loss of goodwill, loss of trade secret integrity, loss of client relationships, and reputational injury.

142.    The DTSA, the Puerto Rico Industrial and Trade Secret Protection Act, the Georgia Trade Secrets Act, the Illinois Trade Secrets Act, the Indiana Uniform Trade Secrets Act, and the Texas Uniform Trade Secrets Act expressly authorize injunctive relief.

143.    Specifically, PRITSPA expressly states that "irreparable harm" need not be proven in order to obtain injunctive relief.

144.    To wit, under PRITSPA, the mere finding of violation of trade secrets, as defendants have amply done and continue to do, is enough for this Honorable Court to issue a Preliminary Injunction, which is respectfully requested by Plaintiffs

145.    Madison is entitled to temporary and permanent injunctive relief: (a) prohibiting Defendants from any use, disclosure, copying, transmission, or exploitation of Madison's Confidential Information and trade secrets; (b) requiring return and destruction of Madison's Confidential Information and trade secrets; (c) requiring Defendants to submit their computers and phones for forensic inspection; (d) prohibiting solicitation of Madison clients, transferring Madison client accounts to ARCA, or doing business with any client acquired through the use of Madison confidential information; (e) prohibiting further inducement of Madison personnel to terminate their relationships with Madison; (f) prohibiting interference with Madison's relationships with Madison's clients and referral sources; (g) requiring Defendants to cooperate in an orderly return of the diverted accounts; and (h) such other relief as the Court deems just.

**WHEREFORE**, Madison demands judgment against Defendants as follows:

1) For a permanent injunction enjoining M. Sims from violating the Restrictive Covenants in his Agreement, including but not limited to the non-compete, non-solicit, and confidentiality obligations contained therein;

2) For a permanent injunction enjoining Defendants and their agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all other persons acting in concert with them:

   a. from all further misappropriation of Madison's trade secrets and confidential and proprietary information; and

   b. to return all of Madison's trade secrets and confidential and proprietary information;

3) For an order awarding Madison exemplary damages in an amount twice the amount of actual damages awarded, for willful and malicious misappropriation under the Defend Trade Secrets Act and Puerto Rico's Industrial and Trade Secret Protection Act.;

4) For an order awarding Madison its attorneys' fees under the Defend Trade Secrets Act;

5) For an order requiring an attorney-supervised inspection of all computers, including hard drives and mobile storage devices in Defendants' possession, custody or control, including but not limited to, M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar's personal computers, ARCA's computer network and systems, and any computers used by M. Sims, Quinn, Barwick, Bloom, Boughamza, Chambliss, Emerson, C. Sims, Chong, and Attar in the course of their employment with ARCA;

6) For an award of compensatory damages against Defendants in favor of Madison;

7) For an award of punitive damages against Defendants and in favor of Madison;

8) For an order that Madison recover its costs from Defendants;

9) For pre-judgment and post-judgment interest according to law; and

10) For such other and further relief as the Court deems just and proper.

*MIG Holdings LLC, et al. v. Mark Sims et al.*; Case No. _____
Complaint
Page 36

## VERIFICATION

I, Mark Jacobs, of legal age, married, Madison's CEO, and resident of Florida, United States of America, declare under penalty of perjury pursuant to 28 U.S.C. 1746, that I reviewed the foregoing Verified Complaint, and that the allegations contained therein are true and correct to the best of my knowledge, information, and belief.

In Omaha, Nebraska this 23rd day of July, 2026.

**Mark Jacobs**

**WHEREFORE,** it is respectfully requested that this Honorable Court issue an ORDER for injunctive relief as sought by Plaintiffs and any other order that it sees fit to issue in the benefit of justice.

**IT IS HEREBY CERTIFIED,** that the foregoing Motion was electronically filed with the Clerk of the Court using the CM/ECF system.

**RESPECTFULLY SUBMITTED** in San Juan, P.R., on July 23, 2026.

**WEINSTEIN-BACAL, MILLER & VEGA, P.S.C.**
González Padín Building-Penthouse 154
Rafael Cordero Street,
San Juan, Puerto Rico 00901
Telephone: (787) 977-2550
Telecopier: (787) 977-2559
E-mail: yd@wbmvlaw.com
        pwm@wbmvlaw.com

**S/Yashkiabette De Jesus Blanco**
U.S.D.C. No. 309607

**S/Peter W. Miller**
U.S.D.C. No. 213609

Attorneys for Plaintiffs