**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| MIG HOLDINGS LLC,<br>MADISON INTERNATIONAL INSURANCE COMPANY, I.I.,<br>MIICI EMPLOYEES, LLC,<br>MADISON RE HOLDING COMPANY, INC.<br>and<br>MADISON RE INTERNATIONAL INSURER<br><br>Plaintiffs,<br><br>v.<br><br>MARK SIMS, ARAN QUINN, MARK BARWICK, JOHN BLOOM, MOUAD BOUGHAMZA, ANN MARIE CHAMBLISS, TIERRE EMERSON, CARTER SIMS, JOHN CHONG, and REESE ATTAR<br><br>Defendants. | Case No. 26-CV-1480 (MAJ) |

**OPINION AND ORDER**

## I. INTRODUCTION.

Before the Court is the Urgent Motion for Temporary Restraining Order and/or Preliminary Injunctive Relief (the "Motion") filed by Plaintiffs MIG Holdings LLC ("MIG Holdings"), Madison International Insurance Company, I.I. ("MIICII"), MIICI Employees, LLC, Madison Re Holding Company, Inc. ("MadReH"), and Madison Re International Insurer ("MadReII") (collectively, "Madison" or "Plaintiffs"). *See* (**ECF No. 12**). Madison moves pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1836 *et seq.*, and the Industrial and Trade Secret Protection Act of Puerto Rico, Act No. 80 of June 3, 2011, as amended ("ITSPA"), P.R. Laws Ann. tit. 10 §§ 4131 *et seq.*, against Defendants Mark Sims, Aran Quinn ("Quinn"), Mark

Barwick, John Bloom, Mouad Boughamza, Ann Marie Chambliss, Tierre Emerson, Carter Sims, John Chong, and Reese Attar (collectively, "Defendants").

Madison requests an order (i) restraining Defendants from further acquiring, using, disclosing, transmitting, copying, or destroying Madison's trade secrets and confidential information; (ii) restraining Defendants from exploiting that information to solicit or service Madison's clients, referral sources, prospects, and personnel; (iii) restraining any attempted access to Madison's systems, accounts, databases, and cloud environments; (iv) requiring the immediate return, preservation, and non-destructive forensic inspection of Madison-owned devices and materials; (v) requiring preservation of all potentially relevant electronically stored information; (vi) authorizing narrowly tailored expedited discovery; and (vii) setting a preliminary-injunction hearing at the earliest practicable date. Madison separately seeks enforcement of the restrictive covenants of its former President, Mark Sims. (**ECF No. 12**).

The Motion is supported by the Verified Complaint, sworn under penalty of perjury, and by the exhibits accompanying the Motion. *See* Fed. R. Civ. P. 65(b)(1)(A) (providing that a temporary restraining order may issue where "specific facts in an affidavit or a verified complaint clearly show" entitlement to relief). Because the Verified Complaint and its supporting exhibits are of record and are incorporated herein by reference, the Court does not restate the factual background, and refers to the record only as necessary to its analysis.

On August 13, 2026, the Court issued an order denying Plaintiffs' Motion under Local Rule 65 for failure to include a proposed order. (**ECF No. 16**). Later that day, Plaintiffs submitted a Motion for Reconsideration, attaching a proposed order granting the emergency relief requested. Accordingly, the Court's Order at ECF No. 16 is hereby **VACATED** and the Court proceeds to evaluate the Motion for a Temporary Restraining

Order at ECF No. 12. For the reasons set forth below, the Motion for a Temporary Restraining Order is **GRANTED IN PART AND DENIED IN PART**.

## II. FACTUAL BACKGROUND.

According to the Verified Complaint and the exhibits submitted in support of the Request for TRO,[1] Plaintiffs are affiliated entities engaged in the enterprise-risk and international insurance business in and from Puerto Rico, operating through, among other offerings, a segregated asset plan business model. (**ECF No. 1 ¶¶ 83–84**). Defendant Mark Sims served as Madison's President. (**ECF No. 1 ¶¶ 34–39**). Quinn served as Madison's outside counsel for approximately six years. (**ECF No. 1 ¶ 16**). The remaining Defendants, Barwick, Bloom, Boughamza, Ann Marie Chambliss, Emerson, C. Sims, Chong, and Attar, were senior Madison employees occupying underwriting, operations, marketing, and business-development functions. (**ECF No. 1 ¶¶ 17–23**).

Madison alleges that, in the weeks preceding their departures, Defendants extracted client lists, contact and policy information, actuarial and portfolio analyses, underwriting and risk-profiling guidelines, pricing models, and proprietary business strategies, for the purpose of constructing an international insurer that replicates Madison's business model and targets its customers. (**ECF No. 1 ¶ 8**). Between May 19 and May 28, 2026, Defendant Carter Sims is alleged to have used his Madison credentials to extract approximately 10,570 kilobytes of confidential Salesforce data, an assembled compilation of some 12,111 entries linking identified accounts to referral sources and policy information. (**ECF No. 1 ¶¶ 52–53**); (**ECF No. 12, Ex. A**).

On July 7, 2026, Mark Sims is alleged to have solicited Madison's clients (obtained from Madison's confidential and trade secret client list) from an ARCA email address,

[1] The Court notes that multiple exhibits submitted by Plaintiffs appear as blank pages. (**ECF No. 12, Exs. J, K, M**).

announcing his forthcoming departure, inviting recipients to contact him, and promoting a "Virtual ARCA Town Hall." (**ECF No. 1 ¶¶ 15, 65–66**); (**ECF No. 12, Ex. B**). That same morning, Mark Sims submitted his resignation. (**ECF No. 1 ¶ 60**); (**ECF No. 12, Ex. C**). Within approximately twenty minutes, seven additional employees—Carter Sims, Chong, Emerson, Chambliss, Barwick, Boughamza, and Bloom—resigned as well. (**ECF No. 1 ¶¶ 61–64**); (**ECF No. 12, Exs. D–J**). Madison deactivated their system access. That evening, Mark Sims is alleged to have circulated to Madison's clients a second announcement introducing ARCA's leadership team, composed of the same employees who had resigned hours earlier. (**ECF No. 1 ¶¶ 70–71**).

Quinn is alleged to have terminated his representation of Madison and, within thirty-seven days of that termination, to have incorporated ARCA and installed himself as its President and Secretary. (**ECF No. 1 ¶¶ 51, 57–59, Exs. 2**). Madison further alleges that Mark Sims supported ARCA's formation while still employed by Madison, including by developing ARCA's website through Madison's own branding vendor and by recruiting Madison's key personnel, and that ARCA's investor materials, five-year forecast, and Investment Offering Term Sheet replicate Madison's proprietary plans, pricing, and strategies nearly line for line. (**ECF No. 1 ¶¶ 75–76, Exs. 3–5**).

As to the preservation of evidence and the retention of Madison's property, Madison alleges that Mark Sims deleted more than 33,000 emails from his Madison account in the thirty days preceding his resignation (**ECF No. 12, Ex. L**), and that Defendants' counsel disclosed that Mark Sims reset his company-issued computer on the morning he resigned, before any litigation-hold notice issued, attributing the deletions to a routine practice. (**ECF No. 12, Ex. N**). Furthermore, six (6) Defendants, Mark Sims, Emerson, Chambliss, Barwick, Boughamza, and Bloom, were issued Madison laptop computers and equipment

(ECF No. 12, Ex. M); none has returned that property, notwithstanding counsel's agreement to effectuate its return and Madison's transmission of prepaid shipping labels to the addresses Defendants' counsel supplied. (**ECF No. 12, Ex. N**).

Madison filed its Verified Complaint on July 23, 2026. (**ECF No. 12, ECF No. 1**). Summonses issued on July 29, 2026, and Defendant Attar was personally served at approximately 8:12 a.m. that day. (**ECF No. 12, Ex. O**). Later the same day, and while on notice of the Verified Complaint, Attar is alleged to have attempted to access Madison's Salesforce platform, where client and policy data reside; the attempt failed only because Madison had previously revoked her credentials. (**ECF No. 12, Ex. P**). On August 6, 2026, Defendants are alleged to have again used Madison's client information to launch a renewed solicitation for an "ARCA Town Hall" presently scheduled for August 18, 2026. (**ECF No. 12, Ex. Q**). Defendants are further alleged to have established an ARCA presence on LinkedIn through which they continue to target clients appearing on Madison's client list. (**ECF No. 12, ¶ 16, Ex. Q**).

## III. ANALYSIS.

Rule 65 of the Federal Rules of Civil Procedure empowers the Court, in its discretion, to either issue a preliminary injunction or a temporary restraining order ("TRO"). Fed. R. Civ. P. 65. "A temporary restraining order is a provisional remedy imposed to maintain the status quo until a full review of the facts and legal arguments is available." *Ginzburg v. Martínez-Dávila*, 368 F. Supp. 3d 343, 347 (D.P.R. 2019) (internal quotations and citations omitted).

To determine whether to issue a TRO, the Court applies the same analysis used to evaluate a request for a preliminary injunction. *See Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) ("The standard for issuing a TRO is the same as for a preliminary injunction.") (internal quotations omitted). Accordingly, the Court weighs four factors in

determining whether to issue a TRO:

> (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest.

*Central Maine Power Co. v. Maine Commission on Governmental Ethics and Election Practices*, 144 F.4th 9, 19 (1st Cir. 2025). Under Rule 65 of the Federal Rules of Civil Procedure, a court may issue a temporary restraining order only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1)(A)–(B). Because counsel for Defendants have appeared and Plaintiffs filed their motion through CM/ECF, the Court concludes that Defendants have received notice.

Plaintiffs also move for injunctive relief, in part, under ITSPA[2], which explicitly provides that "the court may issue a preliminary injunction order, *for which the plaintiff shall not be under the obligation to prove irreparable damages*." P.R. Laws Ann. tit. 10 § 4136 (emphasis added). "Where a Puerto Rico statute provides for injunctive relief and that relief is 'not tied to a showing of irreparable injury . . . ,' the court need not make findings as to each of the four factors of the common-law test for affording injunctive relief." *Philips Medical Sys. Puerto Rico Inc. v. GIS Partners Corp.*, 203 F. Supp. 3d 221, 240 (D.P.R. 2016) (quoting *DeMoss v. Kelly Servs., Inc.*, 493 F.2d 1012, 1015 (1st Cir. 1974)). Plaintiffs do not meaningfully address whether the excusal of showing irreparable harm under ITSPA extends to the granting of a TRO; however, because Plaintiffs meet their burden under Rule 65 of showing the potential for

---

[2] The Industrial Trade Secret Protection Act of Puerto Rico, Act No. 80 of June 3, 2011, as amended (ITSPA) provides protections for entities and individuals claiming misappropriation of their trade secrets.

irreparable harm absent emergency relief, the Court need not address whether ITSPA enables Plaintiffs to obtain a TRO absent a showing of irreparable damages.

**A. Likelihood of Success on the Merits**[3]

To establish the likelihood of success on the merits of a misappropriation claim under the Defend Trade Secrets Act ("DTSA"), a movant must show "1) the information [sought to be protected] is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007). Moreover, "the trade secret owner has the burden of proof to establish the existence and scope of the alleged trade secret in the litigation." *TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 52 (1st Cir. 2020). The ITSPA, in turn, defines trade secrets in a "substantially similar" manner to the DTSA and likewise requires misappropriation. *MS Distributors LLC v. Synergy Factory LLC (Florida)*, 2026 WL 45052, *2 (D.P.R. Jan. 7, 2026).

**i. The Information Sought to be Protected Likely Constitutes Trade Secrets**

The DTSA defines a trade secret as:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas designs, prototypes, methods, techniques, processes, procedures, programs or codes, whether tangibles or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically, or in writing if:
>
> > a. The owner thereof has taken reasonable measures to keep such information secret; and
> >
> > b. the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can

[3] Plaintiffs also claim that Mark Sims is in violation of a restrictive covenant in his employment agreement and move for the Court to enjoin him from further violation of such covenant. Because Plaintiffs do not provide the Court with said agreement, the Motion is **DENIED WITHOUT PREJUDICE** insofar as it requests such relief.

> obtain economic value from the disclosure or use of the information[.]

18 U.S.C. 1839(3).

Plaintiffs have shown that the information sought to be protected—"client lists, contact and policy information, actuarial analyses, underwriting guidelines, pricing models, and proprietary business strategies"—likely constitute trade secrets under DTSA and ITSPA. (**ECF No. 12 at 3**), and First Circuit precedent The First Circuit has held that an insurer's customer spreadsheets, compiling policy numbers, ownership status, license information, customer status, and premium amounts, constitute protectable trade secrets, and that the presence of some publicly available data within a compilation does not defeat protection where it would be immensely difficult to collect and assemble the data in the format at issue. *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 187 (1st Cir. 2023). The ITSPA, in turn, defines trade secrets as information that "has a present or a potential independent financial value or that provides a business advantage, insofar as such information is not common knowledge or readily accessible through proper means by persons who could make a monetary profit from the use or disclosure of such information[.]" P.R. Laws Ann. tit. 10, § 4132. Such proprietary data regarding customers, sales leads, and actuarial analyses therefore constitute trade secrets under the DTSA and ITSPA. *See Fougere*, 79 F.4th at 187.

### ii. Reasonable Efforts to Preserve Secrecy

Plaintiffs have also made a preliminary showing of reasonable measures to preserve secrecy. "To determine whether a company took reasonable steps to protect its trade secrets" under the DTSA, "courts have considered 1) the existence or absence of a confidentiality agreement, 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable." *Id.* at

192 (internal quotations omitted). Madison avers that it maintains dedicated information-technology security personnel, a documented Confidentiality Policy set forth in its Employee Handbook, unique user identifications and password requirements, and non-disclosure agreements executed by third parties before access is granted. Accordingly, Plaintiffs have made a sufficient showing of likelihood of success on this element.

**iii. Improper Means in Breach of a Confidential Relationship**

Finally, the record presently before the Court supports a likelihood that the information was acquired and used by improper means. Improper means "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A).

Plaintiffs highlight evidence that between May 19 and May 28, 2026, Carter Sims downloaded Salesforce data including the identity of Madison's active clients, campaigns, referrals, and sales leads into a folder entitled "Private Reports." (**ECF No. 12, Ex. A**). Mark Sims subsequently sent solicitation emails to Madison's client and referral list from an ARCA address on the same day of his resignation. The downloading of such information and its use constitute misappropriation. *See Fougere*, 79 F.4th at 195 ("Most damning is the undisputed fact that the spreadsheets found on ABIA's computer contained information . . . which the EA agreements unquestionably designated as confidential, and which constitute trade secrets owned by Allstate."); *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84 (D. Mass. 2024). Furthermore, Mark Sims is alleged to have had an express contractual acknowledgment that he would be exposed to trade secrets and would safeguard them, (**ECF No. 1 ¶ 37**), and Plaintiffs point to evidence that Defendants have not returned their Madison-issued computers despite stating that they would do so. (**ECF No. 12, Ex. N**). The alleged replication of Madison's business plans, pricing, and forecasts in ARCA's investor materials, five-year forecast, and term sheet is further evidence of use. (**ECF No. 1 ¶¶ 75–**

**76, Exs. 3–5**). Accordingly, Plaintiffs show a likelihood that Defendants acquired and used the trade secrets by improper means under the DTSA and ITSPA.

**B. Plaintiffs Face a Potential for Irreparable Harm Absent Relief.**

Irreparable harm is harm that cannot adequately be remedied "either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). As the First Circuit has put it, irreparable harm and the inadequacy of traditional legal remedies are "flip sides of the same coin": if money damages will fully alleviate the harm, the harm is not irreparable. *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989). District courts enjoy broad discretion in evaluating the irreparability of alleged harm. *Id.* Irreparable harm is not a rigid requirement. It is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). Accordingly, "[w]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." *EEOC v. Astra U.S.A., Inc.*, 94 F.3d 738, 743 (1st Cir. 1996).

The harm alleged here is irreparable. The misappropriation of trade secrets is recognized as a quintessential irreparable harm in light of the fact that once a secret is disclosed, its disclosure cannot be undone. *See DraftKings Inc.*, 732 F. Supp. 3d at 120 ("The presumption of irreparable harm recognizes that a 'trade secret once lost is, of course, lost forever.'") (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)). The alleged solicitation of Madison's clients and referral sources through the misappropriated compilation threatens the loss of client relationships and goodwill built over years, the value of which is not readily susceptible of computation. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("If the plaintiff suffers a

substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."). And the conduct is ongoing: Defendants are alleged to have continued soliciting from Madison's client list after the Verified Complaint was filed and served; to have attempted to access Madison's Salesforce platform on the very day of service of process; and to have scheduled a further solicitation event for August 18, 2026. Plaintiffs further point to evidence that Mark Sims deleted approximately 33,000 emails immediately prior to his departure, evidencing that equitable relief is likely required to prevent further potential spoliation. (**ECF No. 12, Ex. L**). Accordingly, the requested equitable relief (other than enforcement of the provisions of Mark Sims employment agreement) is necessary to prevent irreparable harm. *See Philips Medical Sys. Puerto Rico Inc.*, 203 F. Supp. 3d. at 225 (granting similar equitable relief to remedy the disclosure of trade secrets).

### C. On Balance, the Issuance of Injunctive Relief will Impose Lesser Hardships on Defendant than Plaintiff Would Face in the Absence of Injunctive Relief

The Order entered below does not prohibit Defendants from competing with Madison, from soliciting business through lawful means, from working in the insurance industry, or from earning a livelihood. But the court will not permit the use, disclosure, and exploitation of apparent trade secrets, the accessing of systems to which Defendants' credentials have been revoked, the retention of property that belongs to Madison, and the destruction of evidence that Defendants are obligated to preserve. By contrast, denial of relief would leave Madison exposed to the continuing dissemination of its compiled client data and to the continuing erosion of the evidentiary record. Accordingly, the balance of equities favors the granting of the requested relief.

### D. The Public Interest Favors Relief

Congress and the Legislative Assembly of Puerto Rico have each declared a public interest in the protection of trade secrets from misappropriation. *See* 18 U.S.C. §

1836(b)(3)(A); P.R. Laws Ann. tit. 10 § 4136. No countervailing public interest is apparent on this record, and the Order preserves the public's interest in free competition by leaving Defendants at liberty to compete by lawful means.

## IV. CONCLUSION.

For the reasons stated above, Plaintiffs' Motion for Temporary Restraining Order (**ECF No. 12**) is **GRANTED IN PART AND DENIED IN PART**; insofar as the Motion requests that the Court enjoin Mark Sims from violating restrictive covenants in his employment agreement, the Motion is **DENIED WITHOUT PREJUDICE**. Accordingly, it is hereby **ORDERED** that, pending further order of this Court, Defendants Mark Sims, Aran Quinn, Mark Barwick, John Bloom, Mouad Boughamza, Ann Marie Chambliss, Tierre Emerson, Carter Sims, John Chong, and Reese Attar, and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them who receive actual notice of this Order, including ARCA, are:

1. ENJOINED from accessing, acquiring, using, disclosing, transmitting, copying, or destroying Madison's trade secrets, confidential information, or proprietary materials, in any form and by any means;
2. ENJOINED from using Madison's trade secrets or confidential information, directly or indirectly, to solicit, service, contact, or divert Madison's clients, referral sources, prospects, or employees;
3. ENJOINED from accessing or attempting to access Madison's systems, accounts, credentials, databases, servers, or cloud environments, including without limitation Madison's Salesforce platform;
4. ORDERED to return to Madison, within five (5) days of notice of this Order, all Madison-owned devices, equipment, and materials in their possession, custody, or control, and to submit such devices to non-destructive forensic inspection

under a protocol to be agreed by the parties or, absent agreement, set by the Court;

5. ORDERED to preserve all potentially relevant electronically stored information and documents, and ENJOINED from deleting, wiping, resetting, altering, concealing, or disposing of any such information, including electronic mail, messaging applications, cloud storage, and device images;
6. ENJOINED from making further use of any client, referral, or prospect list derived from Madison's records in connection with any event, town hall, presentation, mailing, or social media communication.

Plaintiffs' request for a preliminary injunction is hereby **REFERRED** to United States Magistrate Judge Giselle López-Soler.

This Order shall become effective as of the date and time of its issuance; **the Order shall expire on August 28, 2026 at 11:59 p.m., without prejudice to it being extended for good cause.**

**IT IS SO ORDERED**.

In San Juan, Puerto Rico, on August 14, 2026.

***s/ María Antongiorgi-Jordán***
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**